IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-185

Filed 31 December 2024

Mecklenburg County, No. 21CVD13565

MARY JANE GALLAGHER-MASONIS, Plaintiff,

v.

JOHN MASONIS, Defendant.

Appeal by defendant and cross-appeal by plaintiff from order entered 28 April 2023 by Judge Roy H. Wiggins in District Court, Mecklenburg County. Heard in the Court of Appeals 22 October 2024.

> *James, McElroy & Diehl, P.A., by Preston O. Odom, III, Jonathan D. Feit, and Katherine W. Smith, for plaintiff-appellee/cross-appellant.*
>
> *Amy Elizabeth Simpson for defendant-appellant/cross-appellee.*

STROUD, Judge.

Defendant appeals the trial court's order modifying in part and confirming an arbitration award and consent order. Plaintiff cross-appeals, arguing the trial court erred in not wholly confirming the arbitration award. We affirm the trial court's order.

## I. Background

Plaintiff ("Wife") and Defendant ("Husband") were married in October 2015. Husband and Wife have one child, Francis,[1] born in July 2017. Before the marriage,

---

[1] A pseudonym is used to protect the identity of the minor child.

the parties entered into a premarital agreement that "provided for a waiver of alimony and rendered all property owned by a party as of the date of marriage and also acquired by a party after the date of marriage as that party's [s]eparate [p]roperty." In May 2017, the parties entered into a postnuptial agreement that "declared the [p]remarital [a]greement null and void," but the postnuptial agreement also included terms regarding the agreed classification of marital and separate property.

As to marital and separate property, the primary difference in the premarital agreement and the postnuptial agreement was that the postnuptial agreement provided Husband would sign a Deed transferring ownership of the marital home to Husband and Wife as tenants by the entirety and the marital home would then be "considered [m]arital [p]roperty." As to assets and liabilities other than the marital home, the postnuptial agreement stated:

> **Each party annexed a statement of his or her Separate Property and financial obligations to the parties' Premarital Agreement. Although the parties' Premarital Agreement is being voided with the understanding that this Postnuptial Agreement shall be in full force and effect, each party confirms that the Exhibits attached to the parties' Premarital Agreement confirm each party's Separate Property as of the date of marriage.**

(Emphasis in original.)

Exhibit A of the premarital agreement listed Husband's "Separate assets and liabilities[;]" it listed a residence in Myers Park ("Myers Park Home") with a value of

$1,500,000.00 as his separate property and the mortgage on the Myers Park Home with an "approximate current balance" of $1,000,000.00 as his separate debt. Under the terms of the postnuptial agreement, the Myers Park Home was designated as marital property but the mortgage was still clearly designated as Husband's separate debt.

On 24 August 2021, Wife filed a complaint for child custody and support, divorce from bed and board, and attorney fees. On or about 1 November 2021, Husband filed "Affirmative Defenses; Answer, Counterclaims; Motion for Forensic Psychiatric Evaluation and to Appoint Expert." (Capitalization altered.) The parties separated in November 2021. On or about 30 December 2021, Wife filed a motion in the cause for equitable distribution, postseparation support, and alimony. Wife also filed a notice of voluntary dismissal of the divorce from bed and board claim that same day. On 26 January 2022, the parties entered a Consent Order to Arbitration and Stay of Proceedings in which they agreed to submit "all pending claims and potential claims between them arising out of their marriage" to binding arbitration under the North Carolina Family Law Arbitration Act to be performed by Robin J. Stinson.

Before the arbitration, on or about 11 July 2022, the parties resolved their child custody claims by a "Consent Order (Re: Child Custody)[.]" The consent order granted joint legal custody of Francis to the parties and set out a schedule for physical custody. The consent order left the issue of attorney fees related to custody to be resolved in the arbitration proceeding.

Arbitration was held from 11-14 July 2022.  At the start of the arbitration, the parties entered into a Final Equitable Distribution Pretrial Order ("FPTO") setting out the parties' contentions regarding "classification, valuation, and distribution of property and debts which are claimed to be marital and divisible property and debts." The parties also entered into Stipulations regarding the sale of the home on Isle of Palms ("IOP Home").  The IOP Home was titled to Wife and encumbered by a mortgage held by South State Bank.  The parties agreed to terms for marketing and sale of the IOP Home and gave the Arbitrator the "authority to classify, value, and distribute the marital and/or divisible property and debt components of the net proceeds from the sale" and to "classify, value and return to the separate property owner the separate property component, if any, of the net proceeds of the sale."  The Arbitrator also found "[t]he parties have stipulated that 22 percent of the net value of the [IOP H]ome is [Wife's] separate property and, therefore, the remaining 78 percent of the net value of the home is marital property, which is to be divided between the properties."[2]  As to the equitable distribution claims, the Arbitrator was to rule "on all unresolved issues of classification, valuation, and distribution."  The Arbitrator also was to resolve Wife's claims for alimony and child support.  The Arbitrator heard testimony from Husband, Wife, and four other witnesses; Wife

---

[2] We note the stipulation as to 22% of the IOP Home being separate property and 78% being marital property is not discussed in the parties' "Stipulations" document.  However, neither party disputes this finding and both parties' arguments discuss this stipulation as accurate.

submitted 52 documents as exhibits as evidence at the arbitration, and Husband submitted 476 exhibits.

On or about 12 September 2022, the Arbitrator entered the "Arbitration Decision and Award on Equitable Distribution, Child Support and Alimony" ("Original Arbitration Award"). On or about 3 October 2022, Wife sent a letter to the Arbitrator seeking "to clarify" some provisions of the Original Arbitration Award. Husband responded to this letter on or about 13 October 2022, objecting to some clarifications and accepting others. After a final letter sent by Wife, the Arbitrator entered a "Modified Arbitration Decision and Award on Equitable Distribution, Child Support and Alimony" ("Arbitration Award") on or about 31 October 2022.

As to equitable distribution, the Arbitrator classified the Myers Park Home as marital property based upon the terms of the postnuptial agreement. Also in accord with the postnuptial agreement, the mortgage on the Myers Park Home was classified as Husband's separate debt. The Arbitration Award ordered Husband to continue paying the mortgage on the Myers Park home with specific conditions requiring Husband to pay off the mortgage early. As to the IOP Home, "[t]he parties stipulated that 22 percent of the net value of the home is [Wife's] separate property and, therefore, the remaining 78 percent of the net value of the home is marital property, which is to be divided between the parties." Overall, the Arbitrator concluded "[t]he net value of the parties' marital and divisible estate . . . is $4,959,270.00." The Arbitrator determined "the value of the assets distributed to

- 5 -

[Wife] are $2,961,729.00 and the value of the assets distributed to [Husband] are $1,997,541.00." The Arbitrator determined an equal division of assets "is not equitable in this case" and distributed 57% of the estate to Wife and 43% to Husband. As "57 percent of the net marital and divisible estate is $2,826,783.90" and "43 percent of the net marital and divisible estate is $2,132,486.10[,]" Wife was to pay Husband "a distributive award of $134,945.10" "upon the closing of the sale of the IOP [Home]."

As to alimony, the Arbitrator concluded Husband earned $1,300,000.00 annually and "has been the primary income provider for [Wife] during the marriage." The Arbitrator determined Husband was "able to provide support" to Wife and Wife was "actually and substantially dependent upon his income . . . to maintain her accustomed standard of living during the marriage." Husband was deemed the supporting spouse under North Carolina General Statute Section 50-16.1A. The Arbitrator also noted Husband's act of "illicit sexual behavior" and many other factors in her alimony determination. The Arbitrator ultimately ordered Husband to pay $10,000.00 in alimony to Wife per month starting 1 September 2022 through 31 December 2025.

Finally, as to child support, the Arbitration Award calculated the "reasonable monthly needs" for Francis to be $6,044.74. To meet these needs, the Arbitrator ordered Husband to pay $6,000.00 per month effective 1 September 2022 through 1 August 2023, and then $4,895.00 per month thereafter. Husband was also required

to "continue medical, dental and vision insurance coverage" for Francis and to be responsible "for 100% of the yearly deductible and co-insurance applicable to any reasonable and medically necessary" claim.

On 17 November 2022, Wife filed a "Motion to Confirm Arbitration Award and Consent Order and Enter Judgment/Order" asking the trial court to confirm the child custody consent order and Arbitration Award. The matter came on for hearing on 2 March 2023 and on 28 April 2023 the trial court entered an "Order Confirming Arbitration Award and Consent Order and Entry of Judgment/Orders." Husband filed written notice of appeal on 25 May 2023 and Wife filed notice of conditional cross-appeal "solely to the extent that such ruling does not wholly confirm the Modified Arbitration Decision and Award on Equitable Distribution, Child Support, and Alimony" on 5 June 2023.

## II.     Arbitration

Before we address the issues presented by the parties on appeal, we note that this is an appeal of the trial court's order modifying in part and confirming an arbitration award. In large part, the parties' briefs – especially Husband's – have attempted to treat this appeal as an appeal from a trial court's order after a contested hearing, but arbitration proceedings, and appeals from arbitration awards, are distinct proceedings. After an arbitration is completed, the trial court's job is to determine if the arbitration award should be confirmed, modified, or vacated under North Carolina General Statute Sections 50-53, 50-54, and 50-55, not to retry the

entire case. *See* N.C. Gen. Stat. § 50-53 (2023) ("Confirmation of award."); N.C. Gen. Stat. § 50-54 (2023) ("Vacating an award."); N.C. Gen. Stat. § 50-55 (2023) ("Modification or correction of award."). This Court's job on appeal is to review the trial court's order modifying or confirming the award to determine if it committed any legal error in its confirmation or modification of the arbitration order:

> Our Supreme Court has interpreted the legislative intent of N.C. Gen.Stat. § 1-567.14, whose provisions are virtually identical to N.C. Gen.Stat. § 50-55, in *Cyclone Roofing Co. v. LaFave Co.* and held that:
>
> > Only awards reflecting mathematical errors, errors relating to form, and errors resulting from arbitrators' exceeding their authority shall be modified or corrected by the reviewing courts. If an arbitrator makes a mistake, either as to law or fact[,] unless it is an evident mistake in the description of any person, thing or property referred to in the award, it is the misfortune of the party. There is no right of appeal and the Court has no power to revise the decisions of judges who are of the parties' own choosing.
>
> 312 N.C. 224, 236, 321 S.E.2d 872, 880 (1984) (internal citations omitted). The Court explained that:
>
> > an award is intended to settle the matter in controversy, and thus save the expense of litigation. If a mistake be a sufficient ground for setting aside an award, it opens the door for coming into court in almost every case; for in nine cases out of ten some mistake either of law or fact may be suggested by the dissatisfied party. Thus arbitration instead of ending would tend to increase litigation.

*Semon v. Semon*, 161 N.C. App. 137, 142, 587 S.E.2d 460, 463-64 (2003) (citations, quotation marks, brackets, and ellipses omitted).

### III.   Petition for Writ of Certiorari

We first address Wife's petition for writ of certiorari ("PWC") asking this Court to "review the Order Resolving Appellate Record Settlement Dispute . . . entered on 9 February 2024" ("Record-Contents Order").   Wife requests we reverse the trial court's order settling the record and "exclude from consideration the multivolume arbitration transcript and voluminous Rule 9(d) Exhibits that were never filed, served, submitted for consideration, admitted, or made subject to an offer of proof in the trial court within the purview of Appellate Rule 11(c)."

Wife did not file written notice of appeal of the Record-Contents Order under Rule 3 of our Rules of Appellate Procedure, but a trial court order settling a record is not reviewable by an appeal.  *See Handy Sanitary Dist. v. Badin Shores Resort Owners Ass'n, Inc.*, 225 N.C. App. 296, 304, 737 S.E.2d 795, 801 (2013) ("Only the judge of the superior court or of the district court from whose order or judgment an appeal has been taken is empowered to settle the record on appeal when judicial settlement is required. This Court has held that the appellate court is bound by the contents of the record on appeal. The record imports verity and the Court of Appeals is bound thereby. Where asked to settle the record on appeal, the trial judge then has both the power and the duty to exercise supervision to see that the record accurately presents the questions on which this Court is expected to rule. This Court must receive and act upon the case settled for this Court as importing absolute verity and as it comes from the court below. This Court has no authority to suggest to, direct or

- 9 -

require the judge, in settling the case, as to what facts he shall state, or what matter he shall set forth. Thus, the trial judge's settlement of the record on appeal is final, and cannot be reviewed by this Court on appeal." (citations omitted)).

Wife contends this Court should grant review by certiorari under North Carolina Rule of Appellate Procedure 21(a)(1), which provides that "in appropriate circumstances . . . to permit review of the judgments and orders of trial tribunals . . . when no right of appeal from an interlocutory order exists[.]" N.C. R. App. P. 21(a)(1). Wife cites to our Supreme Court's decision in *Craver v. Craver*, where the Court noted that

> [g]enerally the action of the trial judge in settling the record on appeal when the parties cannot agree thereon is final and not subject to direct appeal. However, a challenge to the trial court's settlement may be preserved by an application for certiorari *made incidentally* with the perfection of the appeal upon what record there is.

298 N.C. 231, 237, n. 6, 258 S.E.2d 357, 361, n. 6 (1979) (emphasis in original). Although this Court does have discretion to review a trial court's settlement of the record on appeal by granting certiorari, "[o]ur courts have frequently observed that a writ of certiorari is an extraordinary remedial writ." *Branch Banking & Tr. Co. v. Peacock Farm, Inc.*, 241 N.C. App. 213, 220, 772 S.E.2d 495, 500 (2015) (citations and quotation marks omitted).

A party seeking review in this manner should ordinarily demonstrate legal error or other merit sufficient to justify this action; "[w]e ordinarily allow such

- 10 -

petitions only where there are wide-reaching issues of justice and liberty at stake and the issues on appeal are meritorious." *LouEve, LLC v. Ramey*, 286 N.C. App. 263, 268, 880 S.E.2d 431, 435 (2022) (citation and quotation marks omitted).

Wife's petition here challenges the trial court's inclusion in the settled record 1,540 pages of transcript from the arbitration hearing and 8,034 pages of a "compendium of Rule 9(d) copies of Exhibits and Other Items" "that neither party filed, served, submitted for consideration, admitted, or made the subject of an offer of proof regarding their competing motions to confirm or vacate the underlying arbitration award." She contends that the trial court did not receive or consider the transcript or the exhibits at the hearing on confirmation of the Arbitration Award. Although the parties quibble in the briefs about the meaning of "submitted for consideration" and "served" in Rule11(c), it is apparent from the transcript of the hearing on confirmation of the Arbitration Award that the trial court did not consider or receive most, if not all, of these 9,600 pages of transcript and documents at the confirmation hearing.[3] But Wife's petition overlooks another portion of Rule 11(c):

> The functions of the judge in the settlement of the record on appeal are to determine whether a statement permitted by these rules is not factually accurate, to settle narrations of proceedings under Rule 9(c)(1), and to determine whether the record accurately reflects material filed, served, submitted for consideration, admitted, or made the

---

[3] All of the documents were in evidence at the arbitration. Some of the documents were certainly discussed or considered in the trial court hearing, but the arbitration transcript was not. Many of the documents, such as copies of hundreds of pages of financial accounts statements, were not addressed at all before the trial court.

> subject of an offer of proof, *but not to decide whether material desired in the record by either party is relevant to the issues on appeal, non-duplicative, or otherwise suited for inclusion in the record on appeal.*

N.C. R. App. P. 11(c) (emphasis added).

In settling the record, the trial court was *not* deciding "whether material desired in the record" was "relevant to the issues on appeal, non-duplicative, or otherwise suited for inclusion in the record on appeal." *Id*. Wife's primary argument is really that most, if not all, of the 9,600 pages are not "relevant to the issues on appeal," and she is mostly correct, given the limitations of our review applicable to an appeal of an arbitration award. *Id*. Husband essentially concedes this point, as he argues

> [i]t is clear, that within the confines of the specific facts in this case the Materials are being *offered only for the purpose of providing this Court with the context, should it need it,* which approach is consistent with the North Carolina Rules of Appellate Procedure, Rule 9(a)(1), which requires that the record in a civil action contain "so much of the evidence, set out in the form provided in Rule 9(c)(1), as is necessary for an understanding of all errors assigned."

(Emphasis added.)

The trial court held a hearing on settlement of the record and entered an order. Wife has failed to demonstrate legal error or merit sufficient to justify review of that order by certiorari, and we therefore decline to exercise our discretion to grant review of certiorari of the trial court's Record-Contents Order.

## IV. Husband's Appeal of Confirmation Order

Husband raises two main issues on appeal: (1) "the trial court erred as a matter of law in confirming the equitable distribution decree contained in the [Arbitration A]ward[;]" and (2) "confirmation of the alimony and child support awards constitutes reversible error." (Capitalization altered.) Wife cross-appeals, contending the Arbitration Award should have been confirmed entirely.

**A. Standard of Review**

We are reviewing the trial court's order confirming in part and modifying in part the Arbitration Award. Before the trial court, Husband filed a motion for the trial court to vacate or modify the Arbitration Award under North Carolina General Statute Section 50-54(a)(2), (a)(3) and (a)(8), which states:

> (a) Upon a party's application, the court shall vacate an award for any of the following reasons:
>
> . . . .
>
> (2) There was evident partiality by an arbitrator appointed as a neutral, corruption of an arbitrator, or misconduct prejudicing the rights of a party;
>
> (3) The arbitrators exceeded their powers;
>
> . . . .
>
> (8) If the parties contract in an arbitration agreement for judicial review of errors of law in the award, the court shall vacate the award if the arbitrators have committed an error of law prejudicing a party's rights.

N.C. Gen. Stat. § 50-54.

Husband did not actually raise any argument regarding the Arbitrator under

- 13 -

subsections (2) or (3); he has raised only error of law under subsection (8). Husband requested in the alternative that the trial court modify the Arbitration Award under North Carolina General Statute Section 50-55, which provides that:

> (a) Upon application made within 90 days after delivery of a copy of an award to an applicant, the court shall modify or correct the award where at least one of the following occurs:
>
> (1) There is an evident miscalculation of figures or an evident mistake in the description of a person, thing, or property referred to in the award;
>
> (2) The arbitrators have awarded upon a matter not submitted to them, and the award may be corrected without affecting the merits of the decision upon the issues submitted; or
>
> (3) The award is imperfect in a matter of form, not affecting the merits of the controversy.
>
> (b) If the application is granted, the court shall modify or correct the award to effect its intent and shall confirm the award as modified or corrected. Otherwise, the court shall confirm the award as made.

N.C. Gen. Stat. § 50-55.

Wife filed a motion to confirm the Arbitration Award under North Carolina General Statute Section 50-53, which provides:

> Unless the parties otherwise agree in writing that part or all of an award shall not be confirmed by the court, upon a party's application, the court shall confirm an award, except when within time limits imposed under G.S. 50-54 through G.S. 50-56 grounds are urged for vacating or modifying or correcting the award, in which case the court shall proceed as provided in G.S. 50-54 through G.S. 50-56.

N.C. Gen. Stat. § 50-53.

Under the North Carolina Family Law Arbitration Act, this Court's review of the trial court's order confirming and modifying the Arbitration Award is quite limited. In this case, the parties agreed to arbitration subject to "judicial review of errors of law in the award" so an award may be vacated only if the arbitrator "committed an error of law prejudicing a party's rights." *Barton v. Barton*, 215 N.C. App. 235, 238-39, 715 S.E.2d 529, 531 (2011) (citation omitted).

> If the parties contract in an arbitration agreement for judicial review of errors of law in the award, the court shall vacate the award if the arbitrators have committed an error of law prejudicing a party's rights. N.C. Gen.Stat. § 50-54(a)(8) (2009). The court shall modify or correct the award where (1) there is an evident miscalculation of figures or an evident mistake in the description of a person, thing, or property referred to in the award. N.C. Gen.Stat. § 50-55(a)(1) (2009).
>
> If an arbitrator makes a mistake, either as to law or fact unless it is an evident mistake in the description of any person, thing or property referred to in the award it is the misfortune of the party. There is no right of appeal and the Court has no power to revise the decisions of judges who are of the parties' own choosing. An award is intended to settle the matter in controversy, and thus save the expense of litigation.
>
> If a mistake be a sufficient ground for setting aside an award, it opens the door for coming into court in almost every case; for in nine cases out of ten some mistake either of law or fact may be suggested by the dissatisfied party. Thus arbitration instead of ending would tend to increase litigation.
>
> On appeal of a trial court's decision confirming an

arbitration award, we accept the trial court's findings of
fact that are not clearly erroneous and review its
conclusions of law de novo.

*Id*. (citations, quotation marks, brackets, and ellipses omitted).

Here, neither party has challenged any of the trial court's findings of fact as clearly erroneous. Thus, in this appeal, we "review its conclusions of law de novo." *Id*. (citation and quotation marks omitted).

## B. Arbitration Award of Equitable Distribution

Both Husband and Wife make arguments as to the trial court's confirmation and modification of the Arbitration Award as to equitable distribution. Husband argues (1) the "Arbitrator . . . had no legal authority to make the substantive modifications to the [O]riginal [Arbitration A]ward at the request of counsel[4][;]" (2) the Arbitrator "erred in distributing the former marital residence to Wife[;]" (3) the Arbitrator "erred in the valuation, classification and distribution of the" IOP Home; and (4) the "Arbitrator . . . erred in concluding that it was equitable to award 57% of the marital estate plus prospective alimony of 3 ½ years was equitable (sic)." (Capitalization altered.) Wife cross-appeals, arguing (1) "[t]he trial court erred when it vacated the provision relating to the [A]rbitrator's authority to compel the sale of a

---

[4] We will not address this issue separately. Both parties submitted requests for corrections or clarifications to the Arbitrator as allowed by North Carolina General Statute Section 50-52, *see* N.C. Gen. Stat. § 50-52 (2023), and the only modification Husband contends was improper as a "substantive" change was the modification regarding the terms for payment of the mortgage on the Myers Park Home. We will address this issue directly in reviewing the trial court's confirmation of the Arbitration Award.

marital asset" and (2) "[t]he trial court erred when it vacated the provisions of the [ ]

Arbitration Award incidentally affecting [ ]Husband's separate property."

The Confirmation Order modified the Arbitration Award in two ways. Both

changes involve the Myers Park Home. First, paragraph 3 in the "Sterling Road

House" section of the Arbitration Award states:

> 3. [Husband] requests that the house be sold. However, per N.C. Gen. Stat. Section 50-20, it is the court's role to classify, value and distribute the property and *N.C. Gen. Stat. Section 50-20 does not authorize the court to order the sale of marital assets.* Therefore, the [Myers Park Home] is to be distributed to [Wife].

(Emphasis added.) The trial court vacated the portion of the Arbitration Award that

states "N.C. Gen. Stat. Section 50-20 does not authorize the court to order the sale of

marital assets[,]" italicized above, and confirmed the remaining part of the

paragraph. Then, paragraph 8 in the "Sterling Road House" section states:

> 8. [Husband] shall pay the mortgage of the SunTrust/Truist Principal by making the monthly payments of principal and interest until the mortgage is paid in full, subject to the following conditions. [Husband] shall also be responsible for payment of the 2022 ad valorem property taxes not covered by the mortgage escrow balance. *Upon sale of the IOP house, [Husband] shall make a lump sum payment toward the principal mortgage balance owed of $500,000.00. The outstanding mortgage balance shall be paid off in its entirety by [Husband] no later than December 31, 2025. In the event that [Wife] sells the house prior to December 31, 2025, then [Husband] shall pay directly to [Wife] the monthly principal payments which appear in the mortgage's amortization schedule on until (sic) December 31, 2025, then he shall pay to [Wife] no later than December 31, 2025 the payoff of the mortgage as it*

> *appears on the mortgage amortization schedule for*
> *December 2025.*

(Emphasis added.) The trial court vacated the last three sentences of paragraph 8, italicized above, but confirmed the rest of the paragraph.

### 1. *Legal Error in Distribution of the Myers Park Home and Mortgage*

Husband raises on appeal many arguments challenging the Arbitrator's distribution of the Myers Park Home and the mortgage encumbering the home. He approached this issue from many different angles. His primary objection to the Arbitration Award is that the Myers Park Home was classified as marital property and distributed to Wife while the mortgage on the home was classified as his separate debt and he is responsible for paying that debt. He also contends the Arbitrator had no authority to "distribute" the separate debt to him or to set any conditions on when or how he would pay that debt.

Before addressing his arguments, we note that the classification of the Myers Park Home as marital property and the classification of the mortgage as Husband's separate debt was agreed upon in the parties' postnuptial agreement. Husband is very unhappy about the postnuptial agreement. In his Motion to Vacate and/or Modify the Arbitration Award, he candidly states that

> the only reason that [Husband] had a "separate debt" in the form of a mortgage (i.e. securing the former marital residence – *as provided in more detail hereinbelow*) is because [Wife] threatened to divorce him if he did not change the Prenuptial Agreement and to bring that home into the marital estate. When he succumbed and modified

> the Prenuptial Agreement into a Postnuptial Agreement, an error was made whereby the asset was made a marital asset, but the debt was not. As a result, [Husband] was financially harmed by a) being "bullied" into bringing a separate asset into the marriage; b) being forced to pay what should have been made a marital asset but wasn't because of poor drafting (to the tune of over $1 million debt); c) being "punished" in the "equitable" analysis for having paid that separate debt during the marriage; and d) being denied credit for having paid [Wife's] separate debt during that same marriage."

(Emphasis in original.)

In his contentions regarding factors to be considered under North Carolina General Statute Section 50-20(c) in the equitable distribution, Husband contended as to Factor (c)(12), "[a]ny other factor just and proper[,]" that

> Wife bullied Husband into modifying the prenuptial agreement and into agreeing to title a house he owned prior to the date of marriage into joint names which under North Carolina law is deemed a "gift" to the marriage. This gift has resulted in over $1.1 million being infused into the marital estate which is an inequitable result dramatically in favor of Wife.[5]

In his argument before the trial court on the motion to vacate the Arbitration Award, he again makes this argument at the very start. He argued that the entire Arbitration Award was

> built around having her keep that house. So arguably that -- Other than it being a major law -- error of law, how she

---

[5] Wife countered Husband's contentions on this factor by alleging that the postnuptial agreement provisions on the Myers Park Home were part of an arrangement to protect the marital estate from depletion by Husband's payment of "the college expenses of his three children from his former marriage" as well as his "substantial child support and alimony obligations to his previous wife."

> treated this, it permeates throughout the award, which is another, just another justification for why you can't simply modify the award. You have to vacate it. How this asset and debt were treated in our opinion was -- is the key issue. So I'm going to raise it first.

Thus, Husband's primary argument on this issue was that Wife "bullied" him into voiding their prenuptial agreement and then entering into the postnuptial agreement, and his attorney mistakenly failed to make the mortgage debt marital instead of separate. But Husband has not challenged the postnuptial agreement in any way, and that agreement is very clear. Its meaning was not in dispute, and the Arbitrator correctly applied the terms of the postnuptial agreement. In this appeal, we are considering only whether the trial court committed legal error in confirming the Arbitration Award. *See id.* at 238-39, 715 S.E.2d at 531.

Husband argues that since the mortgage debt was "only in Husband's name and was not refinanced during the marriage" and the Arbitrator "distributed" it as separate property, the "Arbitrator . . . had no legal authority to either 'distribute' his separate debt or to set conditions for the payment thereof." Wife's cross-appeal also involves the former marital home, so we will address her cross-appeal in this section as well. Wife argues "[t]he trial court erred when it vacated the provision relating to the [A]rbitrator's authority to compel the sale of a marital asset" and "[t]he trial court erred when it vacated the provisions of the . . . Arbitration Award incidentally affecting [ ]Husband's separate property[,]" specifically the detailed conditions for Husband's payment of the mortgage.

a. *Payment of Mortgage on the Myers Park Home*

Both Husband and Wife make arguments as to the mortgage encumbering the former marital home. Wife argues the trial court should not have vacated the part of the Arbitration Award that set out how and when the mortgage must be paid while Husband argues the trial court correctly vacated part of the provision outlining payment of the mortgage but should have also vacated the entire provision.

Although both Husband and Wife focus on the specific paragraphs of the Arbitration Award addressing the Myers Park Home and the mortgage, we will include the Arbitrator's findings of fact about the home to place these paragraphs in context:

> 1. As of the date of separation the parties owned a house and lot located [in Myers Park] as tenants by the entirety. The house was built by [Husband] prior to marriage and was titled in his sole name as of the date of marriage. However, the house was re-titled as tenants by the entirety pursuant to the terms of the parties' Agreement and, by the terms of the Agreement, is considered Marital Property.
>
> 2. [Wife] desires to have the house distributed to her, in part, so that [Francis] can continue to live in his home. The home is in the Myers Park area and is within walking distance from [a park], where [Wife] and [Francis] spend a lot of time. [Francis] has friends in the neighborhood with whom he plays.
>
> 3. [Husband] requests that the house be sold. However, per N.C. Gen. Stat. Section 50-20, it is the court's role to classify, value and distribute the property and N.C. Gen. Stat. Section 50-20 does not authorize the court to order the sale of marital assets. Therefore, the [Myers Park Home] is to be distributed to [Wife].

4. Each party offered expert testimony with regard to the current (date of trial) value of the house, with [Wife's] expert opining that the May 19, 2022 fair market value of the house was $2,300,000.00 and [Husband's] expert opining that the June 21, 2022 fair market value of the house was $2,600,000.00.

5. [Husband's] expert used more recent comparison sales in her expert witness report, although it is noted that one of her comparison sales was actually a broker under contract sale. Two of the comparison sales used by [Husband's] experts were sales which occurred after [Wife's] expert had prepared his report. Additionally, the comparison sales utilized by [Wife's] expert were located in a different school district than the school district where the house is located, that being [redacted]. In a fast-moving market, more recent comparison sales are a better indicator of the actual fair market value of the house.

6. The current fair market value, to be distributed to [Wife], is $2,600,000.00. The current SunTrust/Truist mortgage (principal and interest) is distributed to [Husband] as his separate debt.

7. As referenced earlier, the Agreement provides that the SunTrust/Truist Mortgage which is a lien on the house is [Husband's] separate debt. The June 2022 balance owed on this debt is $791,964.88 and the date of separation balance on the mortgage debt is $808,154.57. [Husband's] paydown of the mortgage from date of separation through the date of arbitration was a paydown of support. (it is noted that [Wife] has made no claim for retroactive/back child support or retroactive/back alimony).

8. [Husband] shall pay the mortgage on the SunTrust/Truist Principal by making the monthly payments of principal and interest until the mortgage is paid in full, subject to the following conditions. [Husband] shall also be responsible for payment of the 2022 ad valorem property taxes not covered by the mortgage escrow balance. Upon sale of the IOP house, [Husband] shall make

a lump sum payment toward the principal mortgage balance owed of $500,000.00. The outstanding mortgage balance shall be paid off in its entirety by [Husband] no later than December 31, 2025. In the event that [Wife] sells the house prior to December 31, 2025, then [Husband] shall pay directly to [Wife] the monthly principal payments which appear in the mortgage's amortization schedule [ ] until December 31, 2025, then he shall pay to [Wife] no later than December 31, 2025 the payoff of the mortgage as it appears on the mortgage amortization schedule for December 2025.

The trial court vacated part of the Arbitration Award by removing the italicized

portions of Finding 8:

> 8. [Husband] shall pay the mortgage of the SunTrust/Truist Principal by making the monthly payments of principal and interest until the mortgage is paid in full, subject to the following conditions. [Husband] shall also be responsible for payment of the 2022 ad valorem property taxes not covered by the mortgage escrow balance. *Upon sale of the IOP house, [Husband] shall make a lump sum payment toward the principal mortgage balance owed of $500,000.00. The outstanding mortgage balance shall be paid off in its entirety by [Husband] no later than December 31, 2025. In the event that [Wife] sells the house prior to December 31, 2025, then [Husband] shall pay directly to [Wife] the monthly principal payments which appear in the mortgage's amortization schedule [ ] until December 31, 2025, then he shall pay to [Wife] no later than December 31, 2025 the payoff of the mortgage as it appears on the mortgage amortization schedule for December 2025.[6]*

---

[6] The trial court did not modify the Decree as to the Myers Park Home and mortgage in the Arbitration Award, which provides:

> 6. As his separate debt, [Husband] shall assume and pay in a timely fashion the parties' respective principal and interest obligation on said mortgage, with [Husband] paying the mortgage as outlined above in

(Emphasis added.)

Specifically, Husband argues the "Arbitrator . . . had no legal authority to either 'distribute' his separate debt or to set conditions for the payment thereof." Husband also argues the Arbitrator did not have authority to order him to continue to pay the mortgage on the Myers Park Home at all, since it is his separate debt. We agree neither the Arbitrator nor the trial court have authority to "distribute" a separate debt, but the Arbitration Award does not "distribute" the mortgage. In the context of the Arbitration Award, the Arbitrator was simply recognizing the fact that the mortgage is Husband's separate debt which he is legally responsible to pay. But even if the Arbitrator did not have authority to set out a specific schedule for Husband's payment of the mortgage as a separate debt for purposes of equitable distribution, we cannot overlook the rest of the Arbitration Award, which also addressed child support and alimony. Even the findings specifically addressing equitable distribution note the interplay of the payment of the mortgage with Wife's claims for child support and alimony. As this Court noted in *Capps v. Capps*, there is an "obvious relationship . . . between the property that one has and his or her need for support and the ability to furnish it." 69 N.C. App. 755, 757, 318 S.E.2d 346, 348 (1984). The Arbitrator also made findings of fact regarding distributional factors for

---

the Findings of Fact. [Husband] shall indemnify and hold [Wife] harmless from payment on the [Myers Park Home] mortgage.

purposes of equitable distribution and of factors under North Carolina General Statute Section 50-16.3A for alimony addressing the needs of Wife and Francis for the Myers Park Home. Specifically, the Arbitrator found as a distributional factor that Wife "needs to receive ownership of the former marital residence, where she and [Francis] reside, in order to provide a home for [Francis]. [Wife] and [Francis] have resided in the former marital residence since the date of the separation of the parties." The Arbitrator also considered Husband's "substantial separate debt in the [Myers Park Home] mortgage" and the "non-liquid" character of the Myers Park Home. The Arbitrator found as to the alimony factor of "The Standard of Living of the Spouses Established During the Marriage" that "[t]he parties enjoyed a high standard of living during their six-year marriage. They lived in a 4,844 square foot house, with 5 bedrooms and 4.2 bathrooms."

As a general rule, "the trial court is only permitted to distribute marital and divisible property." *Crowell v. Crowell*, 372 N.C. 362, 368, 831 S.E.2d 248, 252 (2019) (*Crowell I*). Husband relies heavily on our Supreme Court's 2019 opinion in *Crowell I*. Our Supreme Court concluded in *Crowell I* that "trial courts are not permitted to disturb rights in separate property in making equitable distribution award orders." *Id.* at 370, 831 S.E.2d at 254. The Court also stated:

> We acknowledge that where a marriage is in debt, it is difficult to envision a scenario in which the making of a distributive award will not affect a party's separate property in some manner. Nevertheless, within the confines of N.C.G.S. § 50-20, the trial court in this case was

> only permitted to use that debt in calculating the amount
> of the distributive award, *not to dictate how the debt was to
> be paid.*

*Id*. at 371, 831 S.E.2d at 254 (emphasis added) (footnote omitted).

Wife argues this Court's opinion in *Crowell v. Crowell*, 289 N.C. App. 112, 888 S.E.2d 227 (2023) (*Crowell II*), "permits entering a ruling that incidentally affects a party's separate property rights" and

> [t]his Court explained that the original order was overturned not because it had some propensity to affect a party's separate property, but, rather, because it ordered a party to specifically use their separate property to satisfy a marital debt. . . . A court's order that has a collateral effect on separate property, therefore, is entirely permissible.

*Crowell II* stated "[t]he original order was not overturned on the basis that it had some propensity to affect [the p]laintiff's separate property; rather, it was overturned because 'the trial court ordered [the p]laintiff to *use* specific items of separate property to satisfy marital debt, *immediately* affecting her rights in that property.'" *Id*. at 116, 888 S.E.2d at 230 (emphasis in original). Wife contends that the trial court erred by removing the specific conditions for Husband's payment of the mortgage because these conditions are merely a "collateral effect" on the separate debt.

In *Crowell I*, the trial court ordered the plaintiff to sell her separate property to pay a distributive award; our Supreme Court concluded "[b]ecause this component of the trial court's order unquestionably disturbed [the] plaintiff's rights in her separate property, the trial court's actions amounted to an impermissible distribution

of that property." *Crowell I*, 372 N.C. at 370-71, 831 S.E.2d at 254. In both *Crowell I* and *Crowell II*, the parties had no minor children. *Id.* at 363, 831 S.E.2d at 249. *Crowell I* and *II* addressed only equitable distribution; the order on appeal did not include alimony. *See id.* ("Following a three-day hearing, on 15 August 2016, the trial court entered an equitable distribution order and an order denying [the] plaintiff's request for an award of alimony, the latter of which was not appealed. The trial court's decision regarding equitable distribution is the only decision on appeal.").

Here, we must consider the trial court's ruling on the confirmation of the Arbitration Award in the context of the award, which addressed alimony and child support as well as equitable distribution. The parties entered into an Arbitration Agreement to have arbitration of all these claims together. The parties have a child, Wife has primary custody of the child, and they reside in the Myers Park Home. Wife was awarded alimony and child support, and the Arbitration Award includes findings about the home. The needs of Wife for alimony and of Francis for child support both take into account the fact that Husband is paying the mortgage on the home in which they live. Although the Arbitrator found that Wife has household expenses such as utilities and house and yard maintenance, her needs as found by the Arbitrator specifically do not include a mortgage payment on the home because it was being paid by Husband. It is apparent throughout the 41-page Arbitration Award that the Arbitrator here was considering not only equitable distribution but also the need of Wife to remain in the Myers Park Home for the benefit of the child and the potential

consequences of Husband's failure to pay the mortgage on the home as to Wife's need for alimony or child support.

Under these circumstances, and under *Crowell I* and *Crowell II*, the Arbitrator did not have legal authority to require that the mortgage debt be paid early or from the proceeds of the sale of the IOP Home for purposes of equitable distribution. *See id.* at 370, 831 S.E.2d at 254. By requiring him to pay $500,000.00 on the mortgage upon sale of the IOP Home and to pay the balance by a particular date, the trial court required Husband to use his proceeds from the sale to pay down this particular debt, much as the trial court in *Crowell I and Crowell II* attempted to require the plaintiff to sell her separate property to pay a marital debt. *See id.* The trial court correctly vacated this portion of Paragraph 8. Although Husband cannot be required to pay the mortgage early, the trial court did not commit legal error by requiring Husband to continue to pay the mortgage since his failure to do so would directly affect the support of both Wife and the child. Requiring Husband to pay a separate mortgage he was already legally bound to pay in the manner he was already required to pay it does not interfere with his separate assets. Husband may choose to pay the mortgage on the schedule as required by the promissory note, or he may choose to pay it off sooner; the trial court merely required him to comply with his pre-existing legal obligation. The trial court did not err by confirming this portion of Paragraph 8.

Husband also contends the Arbitrator "reversibly erred by separating the real property from the debt that secured it." Specifically, Husband argues the "Arbitrator.

. . effectively ordered the divestment of Suntrust/Truist (the third party mortgage creditor/trustee holding legal title to the land) of its 'ownership' of the real property" and thus "effectively triggered default . . . by severing the legal relationship between the Mortgage Debt and its security[.]" It is also undisputed that the mortgage documents were not produced either at the arbitration or to the trial court. Wife asserts this issue could not have been reached for this reason.

The facts of this case are unusual; the parties' postnuptial agreement made the Myers Park Home marital property but made the mortgage a separate debt. But if anyone "separate[ed] the real property from the debt that secured it," it was not the Arbitrator or the trial court, it was the parties, in their postnuptial agreement. Suntrust/Truist is not a party to this case, and we express no opinion whatsoever as to the legal effect, if any, of this arrangement as to any non-party to this action. Husband's argument in this regard is without merit.

Therefore, the trial court correctly vacated the part of paragraph 8 setting out specific conditions for payment of the mortgage as the Arbitrator did not have authority to order these specific conditions for Husband's early payment of a separate debt. And the trial court did not err by denying Husband's request to remove the provision that he

> shall pay the mortgage on the SunTrust/Truist Principal by making the monthly payments of principal and interest until the mortgage is paid in full, subject to the following conditions. [Husband] shall also be responsible for payment of the 2022 ad valorem property taxes not covered

by the mortgage escrow balance.

b. *Wife's Cross-Appeal as to Authority to Compel the Sale of the Marital Home*

Wife has cross-appealed and challenges the trial court's modification of the Arbitration Award by striking the portion of paragraph 3 in italics:

> [Husband] requests that the house be sold. However, per N.C. Gen. Stat. Section 50-20, it is the court's role to classify, value and distribute the property *and N.C. Gen. Stat. Section 50- 20 does not authorize the court to order the sale of marital assets*. Therefore, the [Myers Park Home] is to be distributed to [Wife].

(Emphasis added.)

Wife argues "[t]he trial court erred when it vacated [the] Arbitrator['s] . . . finding that she lacked authority to compel the sale of a marital asset under N.C.G.S. § 50-20." Wife argues in this section of her brief that Husband argued to the trial court the Arbitrator must have erroneously relied on *Miller v. Miller*, 253 N.C. App. 85, 799 S.E.2d 890 (2017), but "notwithstanding *Miller*, the Arbitrator could compel the sale of a marital asset pursuant to the decision in *Wall v. Wall*, 140 N.C. App. 303, 536 S.E.2d 547 (2000)[.]" But Wife mostly argues that the trial court could not have *known* whether the Arbitrator relied on *Miller*, and since the record does not show "any evidence of what legal authority was filed, served, submitted for consideration, admitted, or made subject to an offer of proof[,]" the trial court could not tell which legal authority the Arbitrator relied on. Wife does not cite to any authority supporting the assertion that the trial court cannot rely on caselaw unless

it is shown in the record that the same caselaw was "filed, served, submitted for consideration, admitted, or made subject of an offer of proof" at arbitration, quoting North Carolina Rule of Appellate Procedure 11(c). This statement from Rule 11(c) applies to evidence and other information provided to the trial court by the parties, not law. In fact, an arbitrator or a trial court can and should rely upon any relevant legal authority needed to address an issue it must decide, whether or not a party has presented that authority. In many cases and on many issues, the parties may not formally submit any case or statute to an arbitrator or court, but that does not mean the arbitrator or trial court can rule without considering any relevant statutes or caselaw. The issue of the sale of the former marital home was raised at arbitration, and Wife does not contend the issue was not preserved; Wife only contends the trial court could not rely on the case argued by Husband to the trial court. The trial court can and should consider any relevant statute or caselaw in its discretion.

But beyond the law the Arbitrator may or may not have relied upon, we have been unable to determine why Wife objects to the trial court's ruling on this portion of the Arbitration Award and what the legal effect of addressing this issue may be. Wife surely does not contend that the Arbitrator should have compelled her to sell the Myers Park Home; that is the opposite of her position. Husband argues the statement that "N.C. Gen. Stat. 50-20 does not authorize the court to order the sale of marital assets" is correct. Whether this statement of law is in general correct or not, neither party has explained what difference our ruling would make in this case,

and we decline to address it further and thus we will not disturb the trial court's ruling in this regard.

We will turn next to the valuation, classification, and distribution of the IOP Home.

## 2. *Valuation, Classification, and Distribution of the IOP Home*

Husband next argues the Arbitrator erred "in the valuation, classification, and distribution of the [IOP Home]" (1) "in her treatment of payments by the marriage toward Wife's separate debt/asset" and (2) "by failing to consider the capital gains consequence from the sale of [the] IOP [Home]." (Capitalization altered.)

### a. *Treatment of Payments Toward the IOP Home on Wife's Separate Debt/Asset*

Husband first argues the "Arbitrator . . . erred in her treatment of payments by the marriage toward Wife's separate debt/asset." Husband contends the "Arbitrator . . . ignored th[e] directive" under North Carolina General Statute Section 50-20(c)(8) which "<u>requires</u> that in determining what constitutes an equitable distribution of the marital property, trier of fact is to consider any direct contribution to an increase in the value of separate property that occurs during the marriage." (Emphasis in original.)

Under North Carolina General Statute Section 50-20(c)(8),

> [t]here shall be an equal division by using net value of marital property and net value of divisible property unless the court determines that an equal division is not equitable. If the court determines that an equal division is

> not equitable, the court shall divide the marital property and divisible property equitably. The court shall consider all of the following factors under this subsection:
>
> . . . .
>
> (8) Any direct contribution to an increase in value of separate property which occurs during the course of the marriage.

N.C. Gen. Stat. § 50-20(c)(8) (2023). We also note the parties made several stipulations as to the IOP Home, which are binding upon the parties. *See Clemons v. Clemons*, 265 N.C. App. 113, 117, 828 S.E.2d 501, 505 (2019) ("It is well-established that stipulations in a pretrial order are binding upon the parties and upon the trial court. . . . In equitable distribution cases, stipulations in the pretrial order are intended to limit the evidence needed and to define the issues the trial court must decide." (citations omitted)).

One of the stipulations noted in the Arbitration Award is that "22 percent of the net value of the [IOP H]ome is [Wife's] separate property, and, therefore, the remaining 78 percent of the *net* value of the home is marital property, which is to be divided between the parties." (Emphasis added.) Husband states "the parties stipulated that 22 percent of the asset and debt (i.e. the net value) of [the] IOP [Home] was Wife['s] separate property and the remaining 78 percent was marital." Wife contends the underlying mortgage ("South State Mortgage") was not a part of this stipulation. But by stipulating "22 percent of the *net value* of the home" is Wife's separate property and "78 percent of the *net value* of the home is marital property[,]"

(emphasis added), the underlying debt should be part of this valuation. *See McNeely v. McNeely*, 195 N.C. App. 705, 710, 673 S.E.2d 778, 781 (2009) ("Prior to ordering an equitable distribution of marital property, the trial judge is required to calculate the net fair market value of the property. The trial court calculates the net fair market value of a property, by reducing its fair market value by the value of any debts that are attached to the property." (citations and quotation marks omitted)). Wife contends the stipulation must have only been as to the "asset itself, the IOP Home, and not to the underlying debt . . . as evidenced by [Husband's] contention that he sought a dollar-for-dollar credit on the paydown of the entire SouthState Mortgage[.]" But Wife's argument ignores the plain language of the parties' written Stipulations[7] regarding the sale of the IOP Home and the distribution of the net proceeds of the sale:

> For purposes of this Agreement, the term "net proceeds from sale" shall be defined to mean the gross sales price *less mortgage payoffs (the South State Bank indebtedness referenced above),* real estate commissions, tax pro-rations, revenue stamps, homeowners' association dues, reimbursement to Husband of 50% of repairs advanced by him as reference in paragraph 9 above, and other closing costs attributable to the sellers in accordance with the parties' real estate sales contract, plus any amount due the parties by way of refund or escrowed funds, final payoff overpayment, or other similar items.

---

[7] These Stipulations did not address the 78% marital and 22% separate property classification as noted in the Arbitration Award; that portion of the stipulation was apparently made separately, perhaps at the arbitration hearing. But neither party challenged the Arbitrator's finding on the stipulation of these percentages.

(Emphasis added.) They also stipulated that the Arbitrator "shall have the authority to classify, value, and distribute" the marital or divisible property and debt components of the "net proceeds" of the sale.

Husband contends he "paid 100% of all expenses associated with [the] IOP [Home] from his marital earnings . . . and after the date of separation, Husband paid 100% of all expenses associated with [the] IOP [Home] from marital monies." Husband argues "Wife's separate debt was paid by the marriage for every one of [the 53 months between the purchase and closing]." Husband argues the Arbitrator "refused" to

> a) classify the marital monies paid out of Husband's marital accounts toward the reduction of marital debt post-date of separation as divisible; b) distribute the divisible property as part of equitable distribution; c) order that Wife pay the closing costs associated with the sale of her separate interest post-date of separation; or d) give Husband an unequal distributional factor in his favor for the marriage's substantial payment of Wife's separate debt.

(Footnotes omitted.)

However, Wife contends "Husband did not calculate or otherwise indicate how much the marriage contributed towards the paydown of the SouthState Mortgage during the marriage" and argues Husband "did not present evidence on the marriage's contribution towards paydown of [ ]Wife's separate property portion of the SouthState mortgage during the marriage." And while Husband asserts in his brief that he "paid the marital and separate components of the expenses for the IOP

Ho[m]e from Wells Fargo [ ], a marital bank account," he did not argue at arbitration that the trial court should consider "[a]ny direct contribution to an increase in value of separate property which occurs during the course of the marriage" as shown by the FPTO. Husband left the section for his arguments addressing "[a]ny direct contribution to an increase in value of separate property which occurs during the course of the marriage" under North Carolina General Statute Section 50-20(c)(8) blank. *See Wood v. Weldon*, 160 N.C. App. 697, 699, 586 S.E.2d 801, 803 (2003) ("As has been said many times, the law does not permit parties to swap horses between courts in order to get a better mount, meaning, of course, that a contention not raised and argued in the trial court may not be raised and argued for the first time in the appellate court." (citations and quotation marks omitted)).

While Husband did not argue at arbitration or to the trial court about the IOP Home expenses during the marriage, he did make arguments as to the effect of expenses from after separation to the arbitration. Specifically, in the FPTO spreadsheet as to the South State Mortgage, it states "H[usband] seeks dollar credit for these amounts as divisible property or his separate property or as a factor in the calculation of an unequal distribution." But the Arbitration Award recognized the stipulations "give the Arbitrator the authority to reimburse [Husband] for any part of the monies he pays to maintain the IOP [H]ome from the date of separation through the date of closing" and also found for purposes of equitable distribution, Husband "should be reimbursed for the payments made by [Husband] for mortgage installment

payments (principal and interest), property taxes, and homeowners' insurance premiums from July 11, 2022 through the closing on the sale of the IOP [Home] prior to the distribution of the remaining proceeds[.]" Thus, the Arbitrator considered these payments and ordered Husband be reimbursed.

Husband also argues he "received no credit for these payments as 'reasonable' post-separation support or child support." However, Wife argues "[t]his is simply inaccurate. The Arbitrator explicitly found that [ ]Husband's post-date of separation payments towards the IOP [Home] Expenses from date of separation constituted support for [ ]Wife and the minor child." But in the Arbitration Award the Arbitrator found as follows:

> The amounts [Husband] has paid on these expenses from date of separation through July 11, 2022 are (sic) set forth on Exhibit A are to be considered in the nature of support for [Wife] and [Francis], and [Husband] shall receive no credit for these payments. However, [Husband] should be reimbursed for the payments made by [Husband] for mortgage installment payments (principal and interest), property taxes, and homeowners' insurance premiums from July 11, 2022 through the closing on the sale of the IOP [H]o[me] prior to the distribution of the remaining proceeds between the parties

Thus, the Arbitrator *considered* post-separation and child support in this context but gave Husband "no credit for these payments" as Husband contends. Husband does not demonstrate any error of law in how the Arbitrator addressed the payments he made for the IOP Home.

b.  *Consideration of Capital Gains Tax*

Next, Husband contends the Arbitrator erred "by failing to consider the capital gains consequences from the sale of [the] IOP [Home]." Husband argues North Carolina General Statute Section 50-20(c)(11) "requires that in making an unequal division of the net marital estate to one spouse or another, the trier of fact **must** consider the tax consequences each party would have incurred 'if the marital and divisible property had been sold or liquidated on the date of valuation.'" (Emphasis in original.) The only case Husband cites in this section of his brief is an unpublished case, *Kiell v. Kiell*, 221 N.C. App. 669, 729 S.E.2d 127 (2012) (unpublished), although Husband fails to note the opinion's unpublished status as required by North Carolina Rule of Appellate Procedure 30(e)(3). *See* N.C. R. App. P. 30(e)(3) ("When citing an unpublished opinion, a party must indicate the opinion's unpublished status.").

Nonetheless, as Wife notes, and is shown by the parties' FPTO, in the attached document outlining the parties' arguments as to the valuation, classification, and distribution, Husband left blank the section addressing his argument as to the "tax consequences to each party, including those federal and State tax consequences that would have been incurred if the marital and divisible property had been sold or liquidated on the date of the valuations" under North Carolina General Statute 50-20(c)(11). Husband has not directed us to anything in the record showing Husband produced any evidence at the arbitration or to the trial court as to the tax consequences. Thus, "[a]s [Husband] failed to present evidence during the hearing regarding potential tax consequences caused by an equal distribution, the trial court

did not err in failing to consider tax consequences in awarding an equitable distribution." *Power v. Power*, 236 N.C. App. 581, 584, 763 S.E.2d 565, 567 (2014) (citation omitted). Husband has not demonstrated any legal error in the trial court's confirmation of this portion of the Arbitration Award.

### 3. *Arbitrator's Conclusion as to the Total Award*

Husband's final argument as to the equitable distribution is the "Arbitrator . . . erred in concluding that it was equitable to award 57% of the marital estate plus prospective alimony of 3 ½ years was equitable (sic)." (Capitalization altered.) Husband essentially argues that the Arbitrator "seemingly ignore[d] the interplay" between equitable distribution and alimony. Husband argues that the Arbitrator abused her discretion in the equitable distribution award. He has not identified any legal error either by the Arbitrator or by the trial court.

"On appeal of a trial court's decision confirming an arbitration award, we accept the trial court's findings of fact that are not clearly erroneous and review its conclusions of law de novo." *Barton*, 215 N.C. App. at 239, 715 S.E.2d at 531 (citation omitted). As Husband has failed to argue any error in the trial court's findings of fact or conclusions of law as to the consideration of the equitable distribution factors or the Arbitration Award, this argument is without merit.

### 4. *Conclusion as to Equitable Distribution*

The trial court did not err by vacating the part of paragraph 8 that set out specific conditions as to Husband's early payment of the mortgage and similarly did

not err in confirming the part of paragraph 8 that required Husband to pay the mortgage generally. And Wife has not demonstrated how the statement regarding the Arbitrator's authority to order the sale of the Myers Park Home would affect this appeal, we will not discuss that issue further. Finally, the trial court did not commit any legal error in its modification and confirmation of the equitable distribution Arbitration Award.

## C. Alimony and Child Support Awards

Husband argues the "Arbitrator . . . erred by acknowledging that Wife was underemployed at the time of the proceeding but failing to use earning capacity to calculate alimony and child support" and the "Arbitrator['s] . . . determination of the amount of Wife'[s] child support obligation is manifestly unsupported by reason." (Capitalization altered.) By use of the words, "manifestly unsupported by reason," Husband's argument is phrased as an argument that the Arbitrator abused her discretion. *See, e.g., State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988) ("Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." (citation omitted)). But our standard of review in this appeal is to determine if the trial court committed any legal error in confirming the Arbitration Award. *See Barton*, 215 N.C. App. at 238-39, 715 S.E.2d at 531. To the extent Husband is arguing the Arbitrator abused her discretion, we will not address his argument, as we review the trial court's confirmation of the Arbitration Award of alimony and child support

only for legal error.

> Whether a spouse is entitled to an award of alimony or post-separation support is a question of law. This Court reviews questions of law *de novo.* Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the trial court.

*Collins v. Collins*, 243 N.C. App. 696, 699, 778 S.E.2d 854, 856 (2015) (citations, quotation marks, and brackets omitted).

"Alimony is ordinarily determined by a party's actual income, from all sources, at the time of the order. To base an alimony obligation on earning capacity rather than actual income, the trial court must first find that the party has depressed her income in bad faith." *Kowalick v. Kowalick*, 129 N.C. App. 781, 787, 501 S.E.2d 671, 675 (1998) (citations and emphasis omitted).  Further,

> child support obligations are ordinarily determined by a party's actual income at the time the order is made or modified. Additionally, a party's capacity to earn income may become the basis of an award if it is found that the party deliberately depressed his income or otherwise acted in deliberate disregard of the obligation to provide reasonable support.

*Ellis v. Ellis*, 126 N.C. App. 362, 364, 485 S.E.2d 82, 83 (1997) (citations, quotation marks, and brackets omitted).

> It is clear, however, that before the earnings capacity rule is imposed, it must be shown that the party's actions which reduced his income were not taken in good faith. Thus, where the trial court finds that the decrease in a party's income is substantial and involuntary, without a showing of deliberate depression of income or other bad faith, the trial court is without power to impute income, and must

> determine the party's child support obligation based on the party's actual income.

*Id*. at 364-65, 485 S.E.2d at 84 (citations, quotation marks, and brackets omitted). And, in the child support context, voluntary underemployment can be a basis to impute income instead of using actual income if the underemployment results from "bad faith or deliberate suppression of income to avoid or minimize his or her child support obligation." *Diehl v. Diehl*, 177 N.C. App. 642, 650, 630 S.E.2d 25, 30 (2006) (citation and quotation marks omitted).

Husband does not directly contend in his brief that Wife is acting in bad faith as to her income. As to alimony, Husband contends "there is no logical basis for [the] Arbitrator['s] . . . determination that Wife 'needs' 3 ½ years from the Proceeding and winter break of [Francis's] kindergarten year to find a job and get him settled" since both Francis and Wife are healthy, "Wife voluntarily left a full-time job paying $160,000 annually[,]" Francis attends school, and Wife has a "paid assistant." Wife notes one of the findings from the Arbitration Award which states:

> Prior to marriage, [Wife] worked as Vice-President of Business Development with [redacted]. Thereafter, she worked as the Director of Development at [redacted]. She later took a development position at [redacted], where she earned approximately $160,000.00. [Wife] left that employment with [Husband's] consent and [Francis] was born one month later and she did not work at all save and except some parttime project work with [redacted]. By and large, for the remainder of the marriage, [Wife] did not work outside of the home through the date of separation, and she was a stay-at-home mother and homemaker through the separation of the parties.

This finding shows the Arbitrator found Wife was not acting in bad faith as she was originally working before and during some of the marriage and only stopped working with the consent of Husband to take care of Francis. Husband does not dispute this fact but contends Wife should "not be allowed to work part-time at home[.]" The Arbitrator considered many factors in its alimony award, including Husband's marital misconduct and relative earnings of each party. There is nothing in our record to suggest the Arbitrator committed legal error by failing to find Wife acted in bad faith or deliberately suppressed her income to receive more support. Husband's argument as to the Arbitrator's use of Wife's actual income instead of earning capacity is without merit.

Finally, Husband argues the "Arbitrator['s] . . . determination of the amount of Wife'[s] child support obligation is manifestly unsupported by reason." Again, Husband seeks to rely upon abuse of discretion, the standard of review we would use for a trial court's order for child support; instead, we are reviewing the trial court's order confirming an arbitration award. The trial court must "vacate the award if the arbitrators have committed an error of law prejudicing a party's rights." N.C. Gen. Stat. § 50-54(a)(8). He has not identified any error of law in the Arbitrator's determination of child support. Husband's main argument is that Wife got "more alimony than she needs," and we have already rejected that argument. Husband has not demonstrated that the trial court committed any error of law in confirming the Arbitration Award as to child support.

## V.  Conclusion

We conclude the trial court did not err in vacating the part of paragraph 8 that set out specific conditions requiring Husband to pay the mortgage early and did not err in confirming the part of paragraph 8 which required Husband to continue paying the mortgage generally.  We also conclude the trial court did not err in confirming the Arbitration Award as to the distribution of the IOP Home, the overall equitable distribution, alimony, and child support.  We therefore affirm the trial court's order.

AFFIRMED.

Judges MURPHY and FLOOD concur.